## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

JAMES COTTON,

                    Plaintiff,

        vs.

WADE STEPHENS JR., and
RAMON ESTEVEZ,

                    Defendants.

**4:18CV3138**


**MEMORANDUM
AND ORDER**

        This matter is before the court on a renewed Motion for Summary Judgment (Filing 75) filed by Defendants, Wade Stephens, Jr. ("Stephens"), and Ramon Estevez ("Estevez"), and on a renewed Motion to Appoint Counsel (Filing 111) submitted by Plaintiff, James Cotton ("Cotton"). For the reasons discussed below, both motions will be denied.

### I. PLAINTIFF'S MOTION TO APPOINT COUNSEL

        Unlike Cotton's previous requests for appointment of counsel, extensions of time, or other miscellaneous relief, which have been clearly designated as motions in a formal caption,[1] see Fed. R. Civ. P. 7(b)(2) & 10(a), this request for appointment of counsel comes in the form of a letter addressed to the Clerk of the Court, which Cotton describes as an "ex parte message" to be "passed along to Judge Richard Kopf." (Filing 111.) There is no certificate of service or any other indication that Cotton mailed a copy of this correspondence to Defendants. Such an ex parte communication is inappropriate.[2] However, the clerk of the court properly docketed

---

[1] See, for example, Filings 19, 26, 28, 29, 36, 39, 49, 52, 66, 68, 69, 72, 78, 79, 82, 90, 104, and 108.

[2] Subject to certain limited exceptions, a judge "should not initiate, permit, or consider ex parte communications or consider other communications concerning a

Cotton's correspondence as a motion[3] on October 1, 2020, and Defendants filed an opposing brief (Filing 112) the following day.[4]

In his motion, which is dated September 22, 2020, Cotton "request[s] that the court "appoint counsel to proceed with the motion for summary judgment answer," which was due on September 25, 2020, because on September 15, 2020, Cotton, who is a prisoner, allegedly "fell ill with Covid-19 infection and secondary bronchitis infection" and was "no longer physically or mentally capable to litigate this action .…" (Filing 111). The court finds it unnecessary to rule on the merits of the motion because, as will be discussed next, Defendants have not made a sufficient showing in support of their renewed Motion for Summary Judgment. Cotton's renewed Motion to Appoint Counsel therefore will be denied without prejudice to reassertion.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants again seek the dismissal of this action based on the defense of qualified immunity. In ruling on Defendant's previously filed motion for summary judgment (Filing 15), the court found there were genuine issues of material fact as to whether Defendants violated Cotton's Fourteenth Amendment rights by using excessive force, and that the alleged constitutional violation was clearly established as of October 24, 2016, when the incident occurred. See Memorandum and Order entered January 2, 2020 (Filing 60).

The only new evidence filed in support of Defendants' renewed Motion for Summary Judgment, which was filed on June 18, 2020, consists of a set of requests

_____

pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested." Code of Conduct for United States Judges, Canon 3, Subsection (a)(4).

[3] "A request for a court order must be made by motion." Fed. R. Civ. P. 7(b)(1). If necessary, a motion may be filed under seal. *See* NECivR 7.5.

[4] Defendants were notified of the filing through the court's electronic case filing system.

for admission (Filing 76) that Defendants contend should be deemed admitted by reason of Cotton's failure to respond. After the filing of Defendants' renewed Motion for Summary Judgment, however, the court granted Cotton's Rule 36(b) motion (Filing 82) and ordered that "Defendants' requests for admission, which were served on Cotton on March 25, 2020, shall not be deemed admitted by reason of Plaintiff's failure to respond to such requests within the time permitted by Rule 36(a)(3) of the Federal Rules of Civil Procedure, and Plaintiff is hereby granted an extension of time, until August 24, 2020, to serve his responses to those requests for admission." Memorandum and Order entered on August 4, 2020 (Filing 95 at 4).

On August 31, 2020, the Clerk of the Court received a mailing from Cotton which contained a motion for extension of time (Filing 104) and a copy of Cotton's responses to Defendants' requests for admission (Filing 103). Cotton certified that he sent a copy of his discovery responses to Defendants' counsel and to the clerk of the court by placing a postage-prepaid mailing in the prison mailbox at the Nebraska State Penitentiary on August 24, 2020. Service of discovery responses is complete upon mailing. Fed.R.Civ.P. 5(a)(2)(C). The court finds the certificate of service meets the requirements of Rule 5, and that the responses were mailed on August 24, 2020, by Cotton depositing them in the prison mailbox.[5]

---

[5] "Under the prison mailbox rule, a pro se pleading is deemed filed upon deposit in the prison mail system prior to the expiration of the filing deadline." *United States v. Harrison*, 469 F.3d 1216, 1217 (8th Cir. 2006); *see Sulik v. Taney Cty.*, 316 F.3d 813, 814-15 (8th Cir. 2003), *overruled on other grounds*, 393 F.3d 765 (8th Cir. 2005) (determining that the prison mailbox rule provides that, if an inmate confined in an institution files a civil complaint, the complaint is timely if it is deposited in the institution's internal mail system on or before the last day for filing). Discovery documents are not "pleadings," *see* Fed. R. Civ. P. 7(a), nor are they to be filed until needed for trial, resolution of a motion, or on the court's order, *see* NECivR 5.4(a), but "as regards application of the [prison mailbox] rule, there is no meaningful distinction between 'service' deadlines and those for 'filing.'" *Faile v. Upjohn Co.*, 988 F.2d 985, 988 (9th Cir. 1993), *disapproved of on other grounds by McDowell v. Calderon*, 197 F.3d 1253 (9th Cir. 1999)). "As with 'filing,' the pro se prisoner who submits his documents to prison authorities surrenders control earlier than the ordinary litigant. In the case of 'service,' the moment at which pro se prisoners necessarily lose control over and contact with their documents is at

The court also granted Cotton's request for a 21-day extension of time to respond to the renewed Motion for Summary Judgment (see Filings 104, 105), and a subsequent request for a 10-day extension of time (see Filings 108, 110). Even so, no opposing brief was filed by Cotton by the final deadline of September 25, 2020. As discussed above, Cotton instead submitted an ex parte request for appointment of counsel.

Although Cotton has failed to respond to Defendants' motion, "[f]ailure to file an opposing brief is not considered a confession of a motion …." NECivR 7.1(b)(1)(C). As a general rule, however, the failure to file an opposing brief will "preclude[ ] the opposing party from contesting the moving party's statement of facts." *Id. See also* NECivR 56.1(b)(1) ("Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response."); Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, …; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). Thus, to the extent the facts set out in Defendants' statement of material facts are properly supported by the record, as referenced therein, they may be deemed admitted.

But in this case, where Cotton has previously opposed a summary judgment motion raising the defense of qualified immunity, and has presented evidence that was considered by the court and found to show that the evidence cited by Defendants did not establish the absence of a genuine dispute, *see* Fed. R. Civ. P. 56(a), it would not be in the interest of justice for the court to ignore Cotton's evidence.[6] While the

---

delivery to prison authorities, not a deposit in the public mails." *Id.* at 989 (holding that "an incarcerated pro se litigant completes 'service' under Fed.R.Civ.P. 5(b) upon submission to prison authorities for forwarding to the party to be served.").

    [6] "Notwithstanding contrary authority, in the interest of justice a judge may deviate from this court's rules or procedures. A deviation supersedes every other rule or procedure." NEGenR 1.1(c). *See, e.g., Hays v. Deutsche Bank Tr. Co. Americas as Tr. for Argent Sec., Inc.*, No. 8:18-CV-600, 2020 WL 3448242, at *5 (D. Neb. Mar. 9, 2020) (court exercised its discretion by not deeming defendants'

court is "not obliged to scour the record looking for factual disputes," *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1033 (8th Cir. 2007), here the factual disputes have already been identified by the court in its Memorandum and Order of January 2, 2020 (Filing 60). The evidence of record that was considered by the court at that time may again be considered with reference to Defendants' renewed Motion for Summary Judgment without running afoul of the Federal Rules. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Defendants' brief in support of their original motion contained a separate, 19-paragraph statement of undisputed facts. (Filing 17 at 1-5.) Cotton did not respond to Defendants' statement of facts in an opposing brief. Instead, Cotton filed a "Response and Cross Motion for Summary Judgment" (Filing 40), in which he disputed all but the first and last paragraphs of Defendants' statement of facts (establishing the dates of his confinement at the Douglas County Correctional Center ("DCCC")) and requested that summary judgment be granted in his favor. Although not styled as an affidavit, this multi-purpose document contains a jurat certifying that is was "subscribed and sworn to" before a notary public on July 24, 2019; the document is signed by both Cotton and the notary public, and it is stamped with the notary public's seal.[7] The document therefore has independent evidentiary value to the extent that Cotton's statements are "made on personal knowledge, set out facts

---

statement of material facts automatically admitted by plaintiff's failure to comply strictly with NECivR 56.1(b)(1)).

[7] A "jurat" is "[a] certification added to an affidavit or deposition stating when and before what authority the affidavit or deposition was made. A jurat typically says "Subscribed and sworn to before me this day of [month], [year]," and the officer (usu. a notary public) thereby certifies three things: (1) that the person signing the document did so in the officer's presence, (2) that the signer appeared before the officer on the date indicated, and (3) that the officer administered an oath or affirmation to the signer, who swore to or affirmed the contents of the document." Black's Law Dictionary (11th ed. 2019). "[A]n affidavit, by definition, is 'a statement reduced to writing and the truth of which is sworn to before someone who is authorized to administer an oath.'" *Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006) (emphasis omitted; quoting *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985)).

that would be admissible in evidence, and show that [Cotton] is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). *See Awnings v. Fullerton*, 912 F.3d 1089, 1099 (8th Cir. 2019) (holding district court did not abuse its discretion in considering affidavits in which affiants did not expressly state they had personal knowledge of the facts recited); *see also Williams v. York*, 891 F.3d 701, 703 n. 2 (8th Cir. 2018) (plaintiff's verified complaint must be treated as the equivalent of an affidavit for summary judgment purposes); *Williams v. Evangelical Ret. Homes of Greater St. Louis*, 594 F.2d 701, 703 (8th Cir. 1979) ("The general rule is that defects in the form of the affidavits are waived if not objected to at the trial court level."). Cotton also filed a personal affidavit (Filing 43) and 358 pages of exhibits (Filing 42). In ruling on Defendants' original motion, the court cited facts stated in Filings 40 and 43,[8] and it will do so again in ruling on Defendants' renewed Motion for Summary Judgment.[9]

Defendants' brief in support of their renewed Motion for Summary Judgment contains a separate, 18-paragraph statement of undisputed facts (Filing 77 at 1-5), which is substantially similar to their previous statement (Filing 24 at 1-5). Both statements rely on the same evidence (Filings 25, 48). The primary differences are

---

[8] The court also referenced certain exhibits in Filing 42, which are medical records that predate Cotton's incarceration at DCCC. These records were relevant to Cotton's ADA and Rehabilitation Act claims, but have little relevancy to his excessive force claim.

[9] As the court stated in rejecting Defendants' arguments that Cotton had not made a sufficient showing in support of his Rule 36(b) motion: "Defendants argue that Cotton has not made a showing that a withdrawal is necessary to preserve a trial on the merits, but, as noted above, the admissions provide the factual basis for their renewed claim of qualified immunity. Defendants also argue that Cotton has not shown that the deemed admissions are untrue, but at least some of the admissions are directly controverted by his verified cross-motion for summary judgment (Filing No. 40) and affidavit (Filing No. 43) filed in opposition to Defendants' first motion for summary judgment. Those sworn statements of fact were cited by the court in its January 2, 2020 memorandum and order, and were found to 'create a genuine issue of fact concerning the first prong of the qualified immunity analysis [*i.e.*, whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right].' (Filing No. 60, p. 29.)" (Filing 95 at 3.)

that facts related to Cotton's dismissed ADA and Rehabilitation Act claims have been omitted in the new statement, and Defendants now also rely upon certain requests for admission that Cotton did not respond to within the time prescribed by Rule 36(a)(3). As already discussed, however, the court permitted Cotton to respond to the requests for admission after the filing of Defendants' Renewed Motion for Summary Judgment, and has determined that his responses were timely served.[10]

In their current statement of facts, Defendants cite Cotton's previous failure to respond to their Requests for Admission Nos. 1-9 and 12-23. (See Filing 77 at 1-5, "Undisputed Facts," ¶¶ 3, 8, 9, 15, 17.) The court must therefore determine whether those requests for admission have now been denied by Cotton.

In Request Nos. 1-9, Cotton is asked to admit that no medical professional diagnosed him with a concussion, severe head trauma, swollen ribs, or torn intercostal on October 24 or 25, 2016.[11] (Filing 76-1 at 3-4.) Cotton has now responded to these requests by stating that medical professionals refused to provide any evaluation or treatment for those conditions on those dates. (Filing 103 at 1-2.) Such responses are not outright denials.

In Request Nos. 12 and 13, Cotton is asked to admit that he requested the use of force incident on October 24, 2016, be investigated by a law enforcement agency for criminal assault, and that at least one member of the Douglas County Sheriff's Office interviewed him in October of 2016 regarding the incident. (Filing 76-1 at 5.) Cotton has since admitted Request Nos. 12 and 13, and added that a "female deputy sheriff with forensics took multiple pictures of Plaintiff's injuries to his head, face, and other areas, along with Coffey and his supervisor." (Filing 103 at 3.)

In Request Nos. 14-16, Cotton is asked to admit that "the Douglas County Sheriff's Office found that you had not been criminally assaulted on October 24,

---

[10] Defendants have not filed a motion to determine the sufficiency of Cotton's answers or objections to these requests for admission, as provided Federal Rule of Civil Procedure 36(a)(6).

[11] Cotton alleges in his Complaint that he sustained these injuries, and also had to have an eyebrow glued shut. See Complaint (Filing 1 at 8).

2016," and that Stephens and Estevez were "never criminally charged for any action arising out of the use of force on October 24, 2016, that is the subject of this lawsuit." (Filing 76-1 at 5.) Cotton has responded "Don't know" to each of these requests. (Filing 103 at 3.) However, Defendants' statement of undisputed facts does not reference Request Nos. 14-16 or include these purported facts.

In Request Nos. 17-20, Cotton is asked to admit that each Defendant "did not yank you out of your chair, abusively grab you, and run with you leaving the housing unit into the hallway," and "did not yank you up on your toes and begin running with you in the hallway such that he forced you to run on your tippy-toes." (Filing 76-1 at 5-6.) Cotton's response to each of these requests is, "Reword with one request" (Filing 103 at 3), which the court construes as an objection as to form.

In Request No. 21, Cotton is asked to admit "that Tyler Smith, who was at that time an inmate within the Douglas County Correctional Center, bit a finger on your left hand on October 24, 2016." (Filing 76-1 at 6.) Cotton also objects to the form of this request by stating, "Reword with one request." (Filing 103 at 3.)

In Request No. 22, Cotton is asked to admit "that on October 24, 2016, prior to the incidents that are the subject of this lawsuit, you were engaged in a physical altercation with inmate Tyler Smith." (Filing 76-1 at 6.) Cotton "[a]dmits that he assaulted me." (Filing 103 at 3.) Again, this is not an outright denial.

And, finally, in Request No. 23, Cotton is asked to admit "that during the altercation with inmate Tyler Smith on October 24, 2016 you struck inmate Tyler Smith in the torso and face." (Filing 76-1 at 6.) Cotton denies Request No. 23. (Filing 103 at 4.)

## A. Defendants' Statement of Material Facts

After removing all facts that Defendants had identified as "deemed admitted" by reason of Cotton's failure to respond to Request Nos. 17-21 and 23, Defendants' statement of material facts reads as follows (with footnoted references to relevant portions of Cotton's sworn statements in Filings 40 and 43):

1. Plaintiff was in DCDC's custody from August 7, 2015, until January 30, 2017. Document 25-1, Declaration of Daniel Scherer ("Scherer Decl.") at ¶4.

2. When Plaintiff was booked into DCDC on August 7, 2015, he received a medical screen that determined he should be placed in Medical Observational Housing for clinical opioid withdrawal (COW) monitoring. Document 25-3, Declaration of Mary Earley ("Earley Decl."), Exs. A-G. During his time there, DCDC's third-party medical provider Correct Care Solutions ("CCS") noted that while he did walk with a limp, he had a steady gate with ambulation. *Id.* at Ex. E. Plaintiff's gait remained steady with ambulation and he used his feet to race through the infirmary in his wheelchair. *Id.* at Exs. D, F, and G. It was determined that a wheelchair was not medically indicated. *Id.* at Ex. G. CCS determined that Plaintiff "may" have access to a wheelchair for transportation from his housing unit only and entered this on Plaintiff's restriction screen. *Id.* at ¶8 and Ex. S.

3. On October 24, 2016, Plaintiff was cellmates with Inmate Tyler Smith ("Smith") in the Protective Custody housing unit (or Housing Unit Max 1). Scherer Decl., Ex. B…. ; *see also* Document 25-4, Declaration of Wade Stephens Jr. ("Stephens Decl.") at ¶7 and Ex. B; Earley Decl., Ex. P.

4. On October 24, 2016, Corrections Officer James Ross ("Officer Ross") was assigned to the Protective Custody housing unit and was performing rounds on the upper tier of the housing unit, he heard a muffled noise and a chair falling. Scherer Decl., Ex. B. Officer Ross immediately went back downstairs and opened the door to Plaintiff's cell, where he found Plaintiff attacking Smith.[12] *Id.* Officer Ross pulled Plaintiff off Smith, had Plaintiff sit in the

---

[12] Cotton denies attacking Smith. He states: "Officer James Ross did not find Plaintiff attacking Inmate Smith. What Ross saw was Plaintiff holding Smith's shirt who was holding Plaintiff's finger in his mouth, while Smith was flailing away at Plaintiff. When Smith realized Ross was present he dropped to the floor and began some type of whining, …." (Filing 40 at 5.) "I did not attack Smith. Smith threw a book at me when I went to the can to urinate. Smith began to flail at me and I grabbed his shirt and pulled it over his head, and at that time Smith bit my finger. When C.O.

dayroom, and called an emergency "code blue." *Id*. Officer Ross ordered the other inmates in the housing unit dayroom to go to their cells and checked on Smith, who appeared to have some sort of erratic display. *Id*.

5. Stephens, Estevez, Officer Russell Hansen ("Hansen"), and other corrections officers responded to the "code blue". Stephens Decl., Ex. B; Document 25-5, Declaration of Ramon Estevez ("Estevez Decl."), Ex. A; Document 25-6, Declaration of Russell Hansen ("Hansen Decl.,"), Ex. B. As the responding officers arrived, they were informed of the inmate fight and observed Plaintiff sitting in a chair in the dayroom. *Id*. Smith appeared to be unconscious and not responding to officers so an emergency "code green" was called for Smith, indicating immediate medical attention was needed.[13] Stephens Decl., Ex. B; Hansen Decl., Ex. B; Scherer Decl. ¶5(b) and Ex. B; Document 48-1, Supplemental Declaration of Daniel Scherer ("Scherer Supp. Decl.") at Ex. F, pp. 5-7.

6. DCDC policy requires that inmates be taken directly to be seen by medical staff after a fight. Scherer Decl. ¶10; Document 25-2, Declaration of Matthew Wheeler ("Wheeler Decl.") at ¶5. To secure Plaintiff in the dayroom and for purposes of escorting him to Housing Unit 15m, Plaintiff was ordered to stand up from the chair and put his hands behind his back; Hansen handcuffed him without incident. Hansen Decl., ¶5; Scherer Supp. Decl., Ex. F, p. 5. Stephens, Estevez, and Hansen all observed Plaintiff stand up from the chair without problems. Hansen Decl., ¶5; Stephens Decl. ¶6; Estevez Decl. ¶5. This was all captured by Camera 146. Scherer Decl. ¶9; Document 25-7, Declaration of Timothy O'Connor ("O'Connor Decl."), Ex. A (Video Archive Player 400 600).

---

Ross entered the room Smith dropped to the floor and began whining curled up in a fetal position." (Filing 43 at 4, ¶ 11.) Plaintiff denies he struck inmate Tyler Smith in the torso and face." (Filing 76-1 at 6, Request No. 23; Filing 103 at 4.)

[13] Cotton further states: "I did not knock Smith unconscious. And at no time was Smith unresponsive." (Filing 43 at 4, ¶ 11.)

7.  Stephens and Estevez initiated the escort by taking the two "hands-on" positions with Plaintiff, meaning they each had a hand on him while walking about a step behind him. Stephens Decl. ¶6; Estevez Decl. ¶6; Hansen Decl., ¶7. Hansen accompanied the escort by walking behind Plaintiff because he was being verbally aggressive towards the officers before the group even left the dayroom of the Protective Custody Housing Unit.[14] Hansen Decl., ¶6. The escorting officers then walked Plaintiff through the secure doors of the housing unit and into the hallway to go to the medical housing unit. Stephens Decl. ¶¶6-7; Estevez Decl. ¶¶5-6; Hansen Decl., ¶¶6-7. This was all captured by Camera 146 and Camera 200. Scherer Decl. ¶9; O'Connor Decl., Ex. A (Video Archive Player 400 600).[15]

8.  …

9.  …

10. After walking out of the housing unit and partially down the hallway on his escort to the medical housing unit following the fight, Plaintiff became difficult, resisting forward movement and acting aggressively toward staff. Estevez Decl. ¶6; Stephens Decl. ¶7; Hansen Decl., ¶7 He demanded a wheelchair for transportation, which Estevez and Stephens did not know Plaintiff could (but was not required to) have for transportations. Stephens

---

[14] Cotton states: "At no time was Plaintiff 'being verbally aggressive towards the officers before the group even left the dayroom of the Protective Custody Housing Unit.' The defendants Estevez and Stephens were never in the 'dayroom.' See video." (Filing 40 at 8.)

[15] Cotton claims the video evidence shows "the defendants yanked Plaintiff up on his toes, in the Sally-Port and began running with Plaintiff forcing him to run on his 'Tippy-toes.'" (Filing 40 at 6; Filing 43 at 5, ¶ 12.) However, the video evidence disproves this claim. The escort proceeds at a brisk pace, but no "yanking" or "running on tippy-toes" is evident. Paragraphs 8 and 9 of Defendants' statement of material facts attempted to use requests for admission that each Defendant "did not yank Plaintiff up on his toes and begin running Plaintiff in the hallway such that [Defendant] forced Plaintiff to run on his tippy-toes." (Filing 77 at 2-3, ¶¶ 8, 9.)

Decl. ¶¶6, 9; Estevez Decl. ¶¶5-7; Earley Decl. ¶8 and Ex. S. Plaintiff ignored orders to keep walking forward. Stephens Decl. ¶7; Hansen Decl., ¶7.[16]

11. Plaintiff pulled away from Stephens, causing Stephens to lose his hold on Plaintiff. Stephens Decl. ¶7; Estevez Decl. ¶8; Hansen Decl., ¶7. To regain control, Estevez leaned Plaintiff against the wall while both Estevez and Stephens continued to give Plaintiff verbal orders not to do that and to keep moving towards Housing Unit 15m. Estevez Decl. ¶8; Stephens Decl. ¶7. Upon moving Plaintiff away from the wall, Plaintiff went dead weight, which is the act of one using one's body weight to slump forward and drag one's feet to impede movement. *Id.*; *see also* Hansen Decl., ¶7. Plaintiff's actions caused Estevez to place his right hand behind Plaintiff's neck and his left hand on Plaintiff's shoulder blade and use balance displacement to place Plaintiff on the floor. Estevez Decl. ¶8. Stephens assisted by dropping down to one knee while securing Plaintiff's right bicep to use balance displacement to bring the Plaintiff down. Stephens Decl. ¶7. This was all captured by Camera 200. Scherer Decl. ¶9; O'Connor Decl., Ex. A (Video Archive Player 400 600).[17]

---

[16] Cotton states that he asked "politely" for a wheelchair while in the Sally-Port, and that "[t]he female officer who handed Plaintiff off to Estevez and Stephens, at the Sally-Port entrance advised them both Plaintiff needed a wheelchair for transport." (Filing 40 at 7; Filing 43 at 5, ¶ 12.) Cotton also claims: "Stephens stated, 'Well your [*sic*] walking today motherfucker,' along with other abusive language" and Estevez stated 'since you like suing people, you can sue us too.'" (Filing 43 at 5, ¶ 12.) According to Cotton, he cried out, "Your [*sic*] hurting me," "I can't keep up," "Please don't hurt me." (Filing 40 at 8.) Cotton labels as a "façade" Defendants' statements that "Plaintiff became difficult, resisting forward movement and acting aggressively toward staff" and that "Plaintiff ignored orders to keep walking forward." (Filing 40 at 9.)

[17] Cotton states: "Whenever I couldn't keep up, the Defendants Stephens and [*sic*] stop, push me up a glass partition; turn me around and as Estevez is slamming me face first to the concrete floor, I recall Estevez stating "let's try this."" (Filing 43 at 5, ¶ 12.) Cotton generally disputes Defendants' statements and describes their version of events as "a work of fiction." (Filing 40 at 10.)

12. When Plaintiff was put on the ground through balance displacement, he sustained a small cut close to his eyebrow that started to bleed. Estevez Decl. ¶9; Stephens Decl. ¶8; Hansen Decl., ¶9. Except for the cut above his eyebrow, Plaintiff did not appear to be physically injured by the balance displacement and remained conscious and responsive during the entire escort. *Id.* Due to the cut Plaintiff sustained when put on the ground through balance displacement and his prior demand for a wheelchair while in the hallway, Estevez and Stephens ordered Hansen to get a wheelchair for Plaintiff to avoid any potential injury. Estevez Decl. ¶10; Stephens Decl. ¶8; Hansen Decl., ¶10. Once the wheelchair was obtained, Plaintiff refused to get up – remaining in a dead weight position, lying on his stomach, and refusing to roll to his side so the officers could get him up into the wheelchair. Stephens Decl. ¶8. Stephens utilized an iron wristlock, which is a pain compliance technique used to accomplish a correctional objective – here to get Plaintiff to stop laying [*sic*] dead weight on his stomach so that the officers could put Plaintiff into the wheelchair. Document 48-4, Supplemental Declaration of Wade Stephens Jr. ("Stephens Supp. Decl.") at ¶6. Stephens used the wristlock to get Plaintiff to roll over so the officers could help him up by the arms. *Id.* It worked and the officers put Plaintiff in the wheelchair and continued to escort him to Housing Unit 15m. *Id.*[18]

---

[18] The video footage from the hallway camera outside the Sally-Port ends at 11:45:00, at which time Cotton is on the floor with Stephens and Estevez on either side of him, and Officer Hansen is grabbing Cotton's ankles. The next sequential video footage, beginning at 11:47:52, shows Cotton being transported in a wheelchair down a different hallway and being placed in an elevator. The gap in the footage is not explained. Cotton claims the missing video footage would have shown "that when Estevez and Stephens slammed Plaintiff to the floor that Plaintiff was knocked unconscious. Then while Plaintiff was repairing his consciousness both Estevez and Stephens were literally pulling Plaintiff by the handcuffs he wore down the hallway, and Plaintiff hearing Stephens telling Plaintiff, 'let's try this again motherfucker.' After the defendants pulling Plaintiff up to the wheelchair, he saw at the end of the hallway, Stephens stated 'here's your wheelchair' and that both him and Estevez picked Plaintiff up off the floor and abusively slammed Plaintiff into the wheelchair." (Filing 40 at 11) Cotton also states Officer Hansen said, "he's unresponsive, maybe we should get him a wheelchair now." (Filing 43 at 5, ¶ 13.)

13. In Housing Unit 15m, CCS treated Plaintiff and glued the cut above his eyebrow closed. Earley Decl., Ex. P. This was captured by Camera 125. O'Connor Decl., Ex. A (Video Archive Player 400 600). After being treated by medical staff, Stephens, Estevez, and Hansen escorted Plaintiff in a wheelchair back to his housing unit. Stephens Decl. ¶10; Estevez Decl. ¶11; Hansen Decl., ¶11.

14. Later that day, Plaintiff submitted an Inmate Request Form demanding further medical treatment, including x-rays. Document 1-6 (Ex. 6 to Compl.). He was seen by CCS the next day on October 25, 2016. Earley Decl., Ex. Q. Medical staff noted that the cut which had been glued had no active bleeding and no swelling was noted, but he still was prescribed ibuprofen. *Id.* The x-rays that were ordered and taken the same day showed that there were no acute abnormalities of his spine. *Id.* at Exs. Q-R.

15. Contrary to Plaintiff's description of his injuries (*see* Document 1, Compl., p. 8), no medical professional diagnosed Plaintiff with a concussion or severe head trauma on October 24, 2016, or October 25, 2016. RFA [Requests for Admission (Filing 76-1)] Nos. 1-4 (deemed admitted). No medical professional diagnosed Plaintiff with swollen ribs on October 24, 2016, or October 25, 2016. RFA Nos. 5-6 (deemed admitted). No medical professional diagnosed Plaintiff with a torn intercostal on October 24, 2016, or October 25, 2016. RFA Nos. 7-9 (deemed admitted).[19]

16. Lieutenant Matthew Wheeler ("Lt. Wheeler"), the on-duty Watch Commander for DCDC on October 24, 2016, conducted an administrative review of the use of force on the same day it occurred. Wheeler Decl. ¶¶6-7. To conduct his review, he watched the video footage and read the reports submitted by the involved officers. *Id.* at ¶7. Lt. Wheeler found the force amounted to soft empty hand control and the use of it was within DCDC

---

[19] As to each of these claimed injuries, Cotton states: "Medical professionals refused to provide any evaluation or treatment" on the dates indicated. Answers to Requests for Admission from Plaintiff (Filing 103).

policy. *Id.* at ¶¶ 8, 11 and Ex. A. DCDC Lieutenant Daniel Scherer ("Lt. Scherer) also conducted an administrative investigation and found the use of force to be within DCDC policy. Scherer Decl. ¶8. Lt. Scherer's investigation also determined that Plaintiff's claim that the officers had used force against him in retaliation for filing a lawsuit against Douglas County was false. *Id.* at ¶11; *see also* Stephens Decl., Ex. A; Estevez Decl., Ex. B; Hansen Decl., Ex. A.

17. Plaintiff claimed the use of force by Stephens and Estevez amounted to a criminal assault so the Douglas County Sheriff's Office ("DCSO") conducted a criminal investigation. Document 1-2 (Ex. 2 to Compl.); Document 25-8, Declaration of Peter Coffey ("Coffey Decl.") at ¶4; RFA No. 12 (deemed admitted). DCSO Deputy Peter Coffey ("Deputy Coffey") watched the video footage of the events from October 24, 2016, and observed that Plaintiff appeared to be pulling and jerking his body away from the officers in what looked like an attempt to get free from them when the officers took Plaintiff to the ground.[20] Coffey Decl. ¶5. Deputy Coffey did not observe any unnecessary force or aggression in the maneuver to bring Plaintiff to the ground. *Id.* Deputy Coffey also observed from the video footage that a wheelchair was obtained for Plaintiff for the remainder of the escort. *Id.* Deputy Coffey talked with Stephens and Plaintiff about the incident. *Id.* at ¶6; *see also* RFA No. 13 (deemed admitted). He noted that the video footage and the account of the events provided by Stephens were consistent while Plaintiff's account had inconsistencies with the video footage. Coffey Decl. ¶6….

18. On January 30, 2017, Plaintiff was released from DCDC to the Nebraska Department of Correctional Services after being convicted of four felonies in *State of Nebraska v. James Cotton*, CR 15-2380, before the District Court of Douglas County, Nebraska. Scherer Decl. ¶4.

(Filing 76 at 1-5.)

---

[20] Cotton states he "did not jerk or pull away from Estevez or Stephens." (Filing 40 at 15.)

B. Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a).

In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *See Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial. *See Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).

The moving party bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the moving party believes show the lack of a genuine issue of material fact.[21] *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the moving party does so, the burden then shifts to the nonmoving party, who "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The existence of a mere scintilla of evidence in support of the nonmoving party's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmoving party. *Barber v. C1 Truck Driver Training, LLC*,

---

[21] This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "The moving party can satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018).

656 F.3d 782, 791-92 (8th Cir. 2011). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson*, 643 F.3d at 1042 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## C. Analysis

Excessive force claims of pretrial detainees, such as Cotton, are analyzed under an objective reasonableness standard. *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017). A court must assess the actions of each officer "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quoting *Bell*, 441 U.S. at 520). Factors relevant to assessing the objective reasonableness of force used by officers include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* (quoting *Kingsley*, 576 U.S. at 397).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right [.]'" *Tolan v. Cotton*, 572 U.S. 650, 655-56, (2014) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation.*" Id.* at 656. "Courts have discretion to decide the order in which to engage these two prongs." *Id.* (citing *Pearson v. Callahan,* 555 U.S. 223,

236 (2009)). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.*

"Generally speaking, the existence of genuine issues of material fact does not mean that a district court may defer addressing a qualified immunity claim until after trial; qualified immunity, after all, is an *immunity from suit* rather than a mere defense to liability, and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Shannon v. Koehler*, 616 F.3d 855, 864 n. 5 (8th Cir. 2010) (internal quotations, alterations, and citations omitted; emphasis in original). "When qualified immunity is raised at the summary judgment stage, the proper course is to view the facts and draw reasonable inferences in the light most favorable to the plaintiff—which 'usually means adopting ... the plaintiff's version of the facts'—and then to assess the constitutionality of the challenged conduct." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 377-78 (2007)).

### 1. Was a Constitutional Right Violated?

In *Ryan*, a pretrial detainee ("Harrell") died while a team of four officers were attempting to extract him from his jail cell for a medical assessment because of erratic and disruptive behavior he had displayed while being held overnight. At the time the team went to enter Harrell's cell, it found him completely naked with a wet sheet draped over his head, screaming and banging on the door. Harrell failed to comply with a directive that he back away from the cell door and lie on his bunk. Then, as the extraction team entered his cell, Harrell rushed at the first officer. The team attempted to subdue Harrell, but he continued actively resisting and bit one of the officers. During this struggle Harrell was knocked to the floor, and several officers held him down while attempting to place his wrists and ankles in restraints. One twice used a taser in drive stun mode. Approximately five minutes after the officers first entered Harrell's cell, they found he was no longer responsive. An autopsy found no significant injury or trauma, but an investigator noted there was a large pool of blood on the cell floor that had come from a laceration on Harrell's head. The district court granted summary judgment in favor of the officers after concluding they had not violated Harrell's constitutional rights. The Eighth Circuit affirmed, stating:

Several factors support the foregoing conclusion [that the defendants' actions, both individually and in combination, were objectively reasonable under the circumstances]. Among the most important is the observation that Harrell was actively resisting the extraction procedure by ignoring directives to lie down on his bunk and resisting the defendants' efforts to subdue him once they entered his cell. The defendants' testimony about the degree of Harrell's resistance is corroborated in that multiple defendants purportedly sustained minor injuries, including a defendant who was bitten by Harrell. The video of the extraction shows that the whole procedure lasted no more than five minutes and that the defendants used the weight of their bodies to restrain Harrell for approximately three minutes while he was actively resisting. The defendants' use of a taser was also restricted to the period in which Harrell was fighting the defendants' efforts to subdue him The autopsy performed after Harrell's death showed that he had suffered no significant injury or trauma and listed the immediate cause of death as "sudden unexpected death during restraint."

Under the totality of these circumstances, we conclude that none of the defendants' actions, either singly or in combination, amounted to an objectively unreasonable application of force. *See Blazek v. City of Iowa City*, 761 F.3d 920, 923 (8th Cir. 2014) (noting that we have rejected an excessive force claim where an officer "'forcefully threw' the plaintiff to the ground, pinned him down, and placed his weight into the plaintiff's back before handcuffing him" even though the plaintiff had only been passively resisting);[22] *Carpenter* [*v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012)] (affirming grant of qualified immunity on excessive force claims to officers who twice tased an individual resisting arrest). The trustee [of Harrell's estate] has thus failed to show that there are genuine factual issues that remain on the question of whether the defendants violated Harrell's right to be free from

_____

[22] The case cited for this proposition by the *Blazek* panel is *Wertish v. Krueger*, 433 F.3d 1062 (8th Cir. 2006), in which the plaintiff was driving erratically, failed to pull over, and would not exit his vehicle after it was eventually stopped. Although the plaintiff was a type 1 diabetic who was experiencing a severe drop in his blood sugar level, the Eighth Circuit held it was objectively reasonable for officers "to assume they were dealing with a belligerent drunk—or perhaps a fleeing criminal— who required forcible detention." *Id.*, at 1067.

> excessive force. We therefore affirm the district court's grant of summary judgment on the basis of qualified immunity to the defendants on the trustee's excessive force claim.

*Id.* at 427-28.

In *Lombardo v. City of St. Louis*, 956 F.3d 1009 (8th Cir. 2020), the parents of pretrial detainee ("Gilbert") who died following an altercation with police officers in a holding cell at the police station, brought a § 1983 action against the city and ten individual officers, claiming the officers violated their son's right to be free from excessive force under the Fourth Amendment.[23] Gilbert was cooperative throughout the booking process and checked "no" to a question asking whether he had a medical condition of which the officers should be aware. While Gilbert was in the cell, the officers observed him engaging in unusual behavior, including waving his hands in the air, rattling the bars of his cell, throwing his shoe, and bobbing up and down. An officer entered the cell and cuffed Gilbert's left wrist, but before he could cuff the right wrist Gilbert began to struggle. The officer, with the assistance of two other officers, brought Gilbert to a kneeling position over a concrete bench inside the cell and cuffed his right wrist. Gilbert began to struggle again and thrashed his head on the concrete bench, causing a gash on his forehead. After Gilbert kicked one of the officers, leg shackles were brought to the cell and applied. More officers came to assist as Gilbert continued to struggle, and he was moved from the bench to a prone position on the floor. One officer put his knees on the back of Gilbert's calves, a second officer placed his knee on Gilbert's leg, and a third officer held Gilbert's arm or leg to prevent him from thrashing his body. After fifteen minutes of struggle in the prone position, Gilbert stopped resisting and the officers rolled him from his

---

[23] Although the excessive force claim in *Lombardo* arose under the Fourth Amendment, rather than the Fourteenth Amendment, the "objective reasonableness" standard that was applied in that case also applies here. *See id.*, 956 F.3d at 1013 (8th Cir. 2020); *see also Jackson v. Buckman*, 756 F.3d 1060, 1067 (8th Cir. 2014) ("The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from the use of excessive force that amounts to punishment. The objective indicia relevant to the excessive-force analysis under the Fourth Amendment guide this due-process inquiry." (quotation marks and citations omitted)).

stomach onto his side. At some point while in the prone position, Gilbert had stopped breathing. The medical examiner's autopsy report stated that the manner of death was accidental and that the cause of death was arteriosclerotic heart disease exacerbated by methamphetamine and forcible restraint. Lombardo presented a conflicting expert report, alleging that Gilbert's cause of death was forcible restraint inducing asphyxia. The district court ruled the officers were entitled to qualified immunity, and the Eighth Circuit affirmed, stating:

> Viewing the facts in the light most favorable to Lombardo [the parent-plaintiff], we find that the Officers' actions did not amount to constitutionally excessive force. This Court has previously held that the use of prone restraint is not objectively unreasonable when a detainee actively resists officer directives and efforts to subdue the detainee. [*Ryan*, 850 F.3d] at 427-28. In *Ryan*, law enforcement officers attempted to extract a detainee from his cell, which the detainee resisted. *Id.* at 424. Officers held the detainee down in the prone position and one officer twice deployed his taser in drive stun mode to allow the other officers to place the detainee's wrists and ankles in restraints. *Id.* In holding that this use of force was not excessive, this Court explained that "[a]mong the most important [factors] is the observation that [the detainee] was actively resisting the extraction procedure by ignoring directives to lie down on his bunk and resisting the [officers'] efforts to subdue him once they entered his cell." *Id.* at 428. Similarly, here, the undisputed facts show that the Officers discovered Gilbert acting erratically, and even though Gilbert was held in a secure cell, it was objectively reasonable for the Officers to fear that Gilbert would intentionally or inadvertently physically harm himself. Further, Gilbert actively resisted the Officers' attempts to subdue him. Indeed, Gilbert struggled with the Officers to such a degree that he suffered a gash to the forehead, and several of the Officers needed to be relieved throughout the course of the incident as they became physically exhausted from trying to subdue Gilbert.

> Nonetheless, Lombardo argues that *Ryan* is not on point. Specifically, Lombardo argues that, unlike *Ryan*, in which the detainee was held in prone restraint for approximately three minutes until he was handcuffed, *id.*, Gilbert was held in prone restraint for fifteen minutes and was placed in this position only after he had been handcuffed and

leg-shackled. Lombardo also argues that she presented expert testimony that Gilbert's cause of death was forcible restraint inducing asphyxia whereas the undisputed cause of death in *Ryan* was sudden unexpected death during restraint. *Id.* at 424. We find these differences to be insignificant. This Court has previously noted that "[h]andcuffs limit but do not eliminate a person's ability to perform harmful acts." *United States v. Pope*, 910 F.3d 413, 417 (8th Cir. 2018), *cert. denied*, —— U.S. ——, 140 S. Ct. 160, 205 L.Ed.2d 51 (2019). As discussed above, the undisputed facts show that Gilbert continued to violently struggle even after being handcuffed and leg-shackled. Specifically, after being handcuffed, he thrashed his head on the concrete bench, causing him to suffer a gash on his forehead, and he continued to violently thrash and kick after being leg-shackled. Because of this ongoing resistance, the Officers moved Gilbert to the prone position so as to minimize the harm he could inflict on himself and others.

  The undisputed facts further show that the Officers held Gilbert in the prone position only until he stopped actively fighting against his restraints and the Officers. Once he stopped resisting, the Officers rolled Gilbert out of the prone position. Lombardo argues Gilbert's resistance while in the prone position was actually an attempt to breathe and an attempt to tell the Officers that they were hurting him. However, under the circumstances, the Officers could have reasonably interpreted such conduct as ongoing resistance. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) (finding irrelevant that a nonviolent misdemeanant was not in fact resisting because "he at least appeared to be resisting"). Finally, Lombardo's expert testimony that the use of prone restraint was the principal cause of Gilbert's death is less significant in light of Gilbert's ongoing resistance, his extensive heart disease, and the large quantity of methamphetamine in his system. *See Hill v. Carroll Cty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009) (finding no excessive force where detainee was hog-tied and plaintiff presented expert testimony that the cause of death was positional asphyxia).

*Id.* at 1013-14.

  In *Parrish v. Dingman*, 912 F.3d 464 (8th Cir. 2019), an arrestee with several physical impairments brought § 1983 action against the officer who conducted the

booking proceeding at a county jail. After completing intake, the officer ("Dingman") handed the arrestee ("Parrish") a mattress and escorted him to a holding cell. During booking and intake, Parrish was cooperative. Surveillance video captured what happened next. Parrish walked through the cell door holding the mattress in front of his chest, but seeing another inmate in the cell, he turned to ask Dingman for an isolation cell because of his physical impairments. Dingman shook his head no. When Parrish stepped forward toward the open cell door, Dingman became concerned that he was being attacked and that Parrish was attempting to leave the holding cell. Dingman then stepped into the cell, pushed Parrish into the wall, leveraged him to the floor with his hands on Parrish's arm and neck, and handcuffed him. Parrish's right wrist was swollen and bruised from the handcuffs. He later received chiropractic treatment for lower back pain and four injured ribs. The district court granted summary judgment in favor of the officer, finding as a matter of law that there was no constitutional violation, and the Eighth Circuit affirmed, stating:

> Parrish argues the use of any force was unreasonable because no reasonable officer would think he was actively resisting or posing any threat—he was unarmed, had significant physical impairments, and was cooperative during booking. *See Brown* [*v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009)] ("[F]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."). He contends this case is similar to *Shekleton*, where the use of force against a suspect with known disabilities was not objectively reasonable. *Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012). *Shekleton*, however, is factually distinguishable. The suspect was not in jail and posed no threat to the officer. *Id.* The officer used a taser— more intrusive force than Dingman used—despite knowing that Shekleton's physical disabilities prevented him from complying with orders to place his hands behind his back. *Id.*

> Parrish was in jail. Jailers like Dingman have an important interest in maintaining order and institutional security within the jail. *See Kingsley*, 135 S.Ct. at 2474. After Dingman refused to give him an isolated cell, Parrish stepped forward toward the open cell door. A reasonable officer could believe Parrish was trying to leave the holding

cell, justifying force to maintain order and security in the jail. *Id.* By holding the mattress in front of his chest and pushing it through the open door, Parrish limited Dingman's ability to close the door and to stop Parrish from leaving the cell. It was reasonable for Dingman to view this as passive resistance and a threat to his safety, further justifying the use of force. *See Hicks* [*v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011)] (explaining the use of force is justified where the officer has a reasonable belief a detainee constitutes a threat to his safety); *Wertish v. Krueger*, 433 F.3d 1062, 1066-67 (8th Cir. 2006) ("When a suspect is passively resistant, somewhat more force may reasonably be required.").

Parrish further contends that the amount of force used was unreasonable. "[O]fficers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham* [*v. Connor*, 490 U.S. 386, 396 (1989)]. Dingman was forced to make a split-second judgment when Parrish suddenly moved toward an open cell door holding the mattress. To restrain and handcuff him, Dingman forced him into the wall and leveraged him to the ground. This is a common technique to restrain individuals and was proportional to the need for force. *See Blazek v. City of Iowa City*, 761 F.3d 920, 923 (8th Cir. 2014) (describing a similar handcuffing technique as a "relatively common and ordinarily accepted non-excessive way to detain an arrestee," quoting *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002)); *Hosea v. City of St. Paul*, 867 F.3d 949, 958-59 (8th Cir. 2017) (finding no constitutional violation where an officer tackled a suspect after he began complying with orders to lower himself to the ground); *Hicks*, 640 F.3d at 842 (holding the officer's use of an arm-bar maneuver to restrain a resistant detainee objectively reasonable). *Cf. Cravener v. Shuster*, 885 F.3d 1135, 1140 (8th Cir. 2018) ("Unarmed, passively resisting subjects can pose a threat necessitating the use of taser force."). Dingman's handcuffing also complied with Hamilton County Jail policy authorizing the use of "hands" and "compliance holds" against a passively resistant inmate. *See Kingsley*, 135 S.Ct. at 2474 (recognizing courts' "deference to policies and practices needed to maintain order and institutional security is appropriate").

> Due to the need to maintain order and institutional security and Dingman's reasonable belief that Parrish posed a security threat, the amount of force used was objectively reasonable. Because he did not violate Parrish's constitutional rights, Dingman is entitled to qualified immunity.

*Id.* at 467-69.

Here, Defendants contend "[i]t was reasonable for [them] to view Plaintiff's refusal to comply with orders and his actions of disrupting the escort through pulling away from Stephens and going deadweight as passive resistance and a threat to their safety, justifying the use of force." (Filing 77 at 11 (citing *Parrish*, 912 F.3d at 468)). A similar argument was made in *Karels v. Storz*, 906 F.3d 740 (8th Cir. 2018), in which the plaintiff ("Karels") contended that an arresting officer ("Storz") had twisted her arm behind her back and body-slammed her onto some concrete steps. The Eighth Circuit agreed with the district court's assessment that there was "a genuine issue as to whether and to what degree Karels was resisting arrest, and, if Karels did resist, whether Storz's use of force was reasonable," *id.* at 744, stating:

> Viewing the evidence in the light most favorable to Karels, we reject Storz's argument that his use of force was justified because a reasonable officer in Storz's position would have viewed Karels's behavior as resisting arrest. Karels testified that she was not given time to comply with the command to put her hands behind her back. Moreover, she "informed defendants she needed to put her cigarette out." Although Karels conceded that it might have felt like she was pulling away from Storz as "Norlin pulled her right arm towards an empty coffee can, and away from Storz, to put out the cigarette," a reasonable officer in Storz's position would have realized that Karels was extinguishing her cigarette, with the other officer's help, just as she intended to do. A jury thus could find that a reasonable officer in Storz's position would not have perceived Karels's actions as resistance.

> Storz contends that we have sanctioned the use of force when an officer interprets an arrestee's actions as resistance, even if the arrestee did not intend to resist. He cites *Carpenter v. Gage*, 686 F.3d 644 (8th Cir. 2012), a case in which the arrestee was having a stroke, and *Ehlers*

> *v. City of Rapid City*, 846 F.3d 1002 (8th Cir.2017), a case in which the
> arrestee claimed that he did not hear the officer's commands. In
> *Carpenter*, the officers knew that a man had chased first responders
> from his home with a baseball bat and that he had access to a rifle. 686
> F.3d at 647. Officers took him down after he ignored both a command
> to stop moving and a threat that an officer would deploy his taser. *Id.*
> In *Ehlers*, "an officer took a fleeing arrestee to the ground after he
> ignored repeated warnings to put his hands behind his back." *Rokusek
> v. Jansen*, 899 F.3d 544, 547 (8th Cir.2018) (summarizing *Ehlers*). The
> officers in *Carpenter* and *Ehlers* faced noncompliant arrestees and
> circumstances that were fraught with danger and unpredictability. In
> contrast, a jury could find that a reasonable officer in Storz's position
> would not have interpreted Karels's actions as noncompliance and
> would have known that Karels posed neither an immediate threat to
> anyone's safety nor a flight risk. In light of the circumstances
> surrounding the take-down, the district court properly concluded that
> genuine disputes of material fact precluded summary judgment.

*Id.* at 745-46 (citations to record omitted; footnote omitted); *see also Rokusek*, 899
F.3d at 547 (when suspect was unarmed and fully within officer's control, but
refused order to stand up to be handcuffed, officer used "more than 'the force
necessary' to handcuff" the suspect when he lifted him off of the ground and threw
him face-first into the floor).

"When opposing parties tell two different stories, one of which is blatantly
contradicted by the record, so that no reasonable jury could believe it, a court should
not adopt that version of the facts for purposes of ruling on a motion for summary
judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, that is not the
situation here. This case instead resembles *Flemons v. Devane*, 779 F. App'x 423,
425 (8th Cir. 2019) (unpublished), in which the Eighth Circuit concluded that
summary judgment was not properly granted on excessive-force claims a county
prisoner ("Flemon") brought against two corrections officers who allegedly
physically attacked and tasered him. The Court of Appeals stated:

> As to these claims, the district court based its grant of summary
> judgment, at least in part, on facts that were genuinely disputed, and did
> not credit Flemons's version of the aspects of the second incident that

were not depicted in the video evidence. *See Wise* [*v. Lappin*, 674 F.3d 939, 941 (8th Cir. 2012)]; *cf. Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The video evidence in the summary judgment record does not show the events that led up to the second incident or Partain tasing Flemons; and it does not conclusively disprove Flemons's version of those aspects of the second incident, as described in his verified complaint and the affidavit he submitted with his summary judgment response. *See Thompson v. City of Monticello*, 894 F.3d 993, 997-98 (8th Cir. 2018) (affirming denial of summary judgment based on qualified immunity on excessive-force claim because, inter alia, video captured only part of incident, did not clearly show key facts, and did not conclusively disprove plaintiff's version of incident); *cf. Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 682 (8th Cir. 2012) (verified complaint is equivalent of affidavit for summary judgment purposes).

*Id.* at 425; *see also Edwards v. Byrd*, 750 F.3d 728, 733 (8th Cir. 2014) (jailhouse video did not blatantly contradict the facts found by the district court for the purpose of summary judgment); *Martinez v. Fields*, 627 F. App'x 573, 575 (8th Cir. 2015) (rejecting district court's finding that video showed pretrial detainee offered resistance to corrections officer who slammed him into a wall, breaking his shoulder).

"[A]t the summary judgment stage in an excessive force case, when the plaintiff and defendant give conflicting accounts and there is no evidence that blatantly contradicts plaintiff's account such as a video or audio recording, the plaintiff's credibility is a jury question." *Robison v. Clawson*, No. 4:12-CV-2205 NAB, 2014 WL 1910284, at *6 (E.D. Mo. May 13, 2014) (citing *Coker v. Arkansas State Police*, 734 F.3d 838, 843 (8th Cir. 2013); *Reed v. City of St. Charles,* 561 F.3d 788, 790-91 (8th Cir. 2009)); see *Walton v. Dawson*, 752 F.3d 1109, 1122 (8th Cir. 2014) (To be sure, a reasonable jury could reject [the plaintiff's] view of the facts and accept [the defendant's] testimony, but "[w]hich story is more plausible we cannot say because 'it is not our function to remove the credibility assessment from the jury.'" *Atkinson v. City of Mountain View, Mo.,* 709 F.3d 1201, 1211 (8th Cir. 2013) (quoting *Kukla v. Hulm,* 310 F.3d 1046, 1050 (8th Cir. 2002)). At this stage, our role is simply to say a reasonable jury could find in [the plaintiff's] favor."). "On

summary judgment, when the parties offer conflicting facts, the court rejects the nonmovant's version of the facts only if that version 'is blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Manning v. Cotton*, No. 8:15CV107, 2016 WL 11658954, at *3 (D. Neb. June 17, 2016) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)), *aff'd in part, dismissed in part*, 862 F.3d 663 (8th Cir. 2017).

Here, Defendants' accounts of the incident are only partially corroborated by the video evidence. While the video evidence "blatantly contradicts" Cotton's claim that "the defendants yanked Plaintiff up on his toes, in the Sally-Port and began running with Plaintiff forcing him to run on his 'Tippy-toes'" (Filing 40 at 6; Filing 43 at 5, ¶ 12), in most other respects it is inconclusive.

First of all, the video evidence contains no audio. Cotton claims the officers were being verbally abusive, whereas he was politely asking for a wheelchair and telling them that he couldn't keep up and was in pain.

Second, the video is of relatively poor quality and the takedown occurred a considerable distance away from the camera, almost out of range. With Stephens and Estevez walking "hands on" slightly behind Cotton, on either side of him, and with a third officer (Hansen) walking directly behind Cotton, it is very difficult to see exactly what happened. Whether it was objectively reasonable for the officers to conclude that Cotton intentionally pulled away from Stephens and then "went dead weight" (Filing 77 at 3, ¶ 11), or whether they should have realized that he simply "couldn't keep up" because of his physical limitations, as claimed by Cotton (Filing 43 at 5), cannot conclusively be determined from the video footage.

Third, and perhaps most importantly, the video cuts off about two seconds after Cotton is taken down to the floor through balance displacement, and Cotton is not seen again until almost three minutes later. Significantly, Defendants have offered no explanation for this three-minute gap in the video evidence. Cotton claims he was rendered unconscious when his head hit the floor, which is not disproved by the video, and it is undisputed that he suffered a cut above one eyebrow during the

take down, which required medical treatment.[24] Cotton also claims that during the missing portion of the video he was dragged down hallway by his handcuffs, picked up, and slammed into the wheelchair. Defendants, on the other hand, contend Cotton was being uncooperative, and it was necessary to use a wristlock pain compliance technique to get Cotton into the wheelchair.

In summary, the facts, taken in the light most favorable to Cotton, show Defendants' conduct violated his right to be free from excessive force under the Fourteenth Amendment when they (1) used a balance displacement technique to take Cotton to the floor, causing Cotton to be injured, and (2) dragged Cotton down hallway by his handcuffs, picked him up off the floor, and abusively slammed him into a wheelchair.

### 2. Was the Constitutional Right Clearly Established?

With respect to the second prong of the qualified immunity analysis, the clearly established right must be defined with specificity. "Specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant

---

[24] This type of injury has been held to support a finding of excessive force. *See, e.g., Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) (three lacerations above eye treated without stitches not de minimis); *Copeland v. Locke*, 613 F.3d 875, 881 (8th Cir. 2010) (holding that cuts, abrasions, and an injury to the knee support a finding of excessive force); *Lambert v. City of Dumas*, 187 F.3d 931, 936 (8th Cir. 1999) (same for a single small cut on the eyelid and small scrapes of the knee and calf); *Dawkins v. Graham*, 50 F.3d 532, 535 (8th Cir. 1995) (same for bruises and a facial laceration). C*f. Davis v. White*, 794 F.3d 1008, 1012 (8th Cir. 2015) ("No case acknowledging this issue has held that serious injuries such as 'a concussion, scalp laceration, and bruising' can be considered de minimis as a matter of law for qualified immunity purposes."). *But cf. Ellison v. Lesher*, 796 F.3d 910, 917 (8th Cir. 2015) ("Our cases characterize relatively minor scrapes, bruises, and contusions as *de minimis*." (citing *Ziesmer v. Hagen*, 785 F.3d 1233, 1236-37 (8th Cir. 2015; *Wertish v. Krueger*, 433 F.3d 1062, 1066-67 (8th Cir. 2006))); *Awnings v. Fullerton*, 912 F.3d 1089, 1101 (8th Cir. 2019) (small laceration over eyebrow was de minimis injury).

legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue. "[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Because the plaintiff has the burden of demonstrating that the law confirming his constitutional right was clearly established, Cotton must identify controlling authority from the Supreme Court or the Eighth Circuit, or else a robust consensus of cases of persuasive authority that places the constitutional question beyond debate. *Hanson*, 915 F.3d at 548.

Defendants argue that "[t]he first use of force – the balance displacement maneuver utilized by Stephens and Estevez – did not violate clearly established law. Stephens and Estevez responded to an incident where Plaintiff had just assaulted another inmate and, during their subsequent escort, Plaintiff passively resisted the officers." (Filing 77 at 17.) Cotton denies assaulting the other inmate, but the truth of the matter is unimportant—Defendants' evidence establishes they were informed that Cotton had instigated the fight and rendered the other inmate unconscious. The objective reasonableness standard is only concerned with "what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. What is important, however, is that Cotton denies offering passive resistance while being escorted down the hallway, and the video evidence is inconclusive on this point.

Defendants are not entitled to qualified immunity simply because they *might* reasonably have believed that Cotton was offering resistance. Such an argument was rejected by the Eighth Circuit in its *Karels* decision:

> Storz contends that it was not clearly established on March 28, 2015, that taking down Karels would constitute excessive force because her "behavior [could] be interpreted as resistance." He relies primarily

on *Blazek v. City of Iowa City*, 761 F.3d 920 (8th Cir. 2014). In *Blazek*, officers drew their guns and entered the apartment of a federal parolee. They encountered the parolee's roommate, who was "'belligerent,' refused to identify himself except as 'the roommate,' and would not stay seated as directed." *Id.* at 922. To handcuff the man, an officer "grabbed his arm, twisted the arm up behind him, and threw him to the ground." *Id.* We held that it was not clearly established that the officer's use of force was unconstitutional, *id.* at 923, comparing the take-down in *Blazek* to the one used by the officer in *Wertish v. Krueger*, 433 F.3d 1062 (8th Cir. 2006). In *Wertish*, officers initiated a traffic stop of a vehicle that reportedly had forced another motorist off the road. Instead of stopping, the vehicle continued to drive erratically and dangerously. When the vehicle finally came to a stop, the officers approached the driver with guns drawn and ordered him to exit the vehicle. He did not comply, so an officer "'forcefully threw' the plaintiff to the ground, pinned him down, and placed his weight into the plaintiff's back before handcuffing him." *Blazek*, 761 F.3d at 923 (quoting *Wertish*, 433 F.3d at 1068 (Bye, J., concurring)). We concluded that the officers' use of force was objectively reasonable, explaining that "[w]hen a suspect is passively resistant, somewhat more force may reasonably be required." *Wertish*, 433 F.3d at 1066-67 (majority opinion).

*Blazek* and *Wertish* do not establish that the slightest resistance justifies any subsequent use of force by an officer, as Storz seems to argue. They instead establish that an officer may use "somewhat more force" on a "passively resistant" suspect. The evidence here would support a finding that Karels was not "passively resistant."... Whether a reasonable officer would have interpreted Karels as being resistant—either passively or actively—is a disputed question of fact that a jury must decide. As set forth above, a jury could find that Karels did not resist at all and that a reasonable officer would have known that she was not resisting.

Viewing the facts in the appropriate light, several cases establish that every reasonable officer would have understood that he could not forcefully take down Karels—a nonviolent, nonthreatening misdemeanant who was not actively resisting arrest or attempting to flee—in the allegedly violent and uncontrolled manner that Storz did. *See Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013); *Montoya*

31

*v. City of Flandreau*, 669 F.3d 867, 873 (8th Cir. 2012); *Shannon v. Koehler*, 616 F.3d 855, 864-65 (8th Cir. 2010); *see also Michael v. Trevena*, 899 F.3d 528, 533 (8th Cir. 2018); *Rokusek*, 899 F.3d at 548; *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1213 (8th Cir. 2013); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009); *Rohrbough v. Hall*, 586 F.3d 582, 586-87 (8th Cir. 2009). To the extent Storz argues that these cases present different facts and circumstances, "there is no requirement that [the plaintiff] must find a case where 'the very action in question has previously been held unlawful,' *see Rohrbough*, 586 F.3d at 587, so long as 'existing precedent [has] placed the statutory or constitutional question beyond debate,' [*Ashcroft v.*] *al-Kidd*, [563 U.S. 731, 741, 131 S.Ct. 2074 (2011)]." *Rokusek*, 899 F.3d at 548 (second alteration in original).

*Karels*, 906 F.3d at 746-47 (citation to record omitted; footnote omitted); *see also Rokusek*, 899 F.3d at 548 ("[S]everal cases establish that every reasonable official would have understood that he could not throw … a nonviolent, nonthreatening misdemeanant who was not actively resisting … face-first to the ground.").

Defendants argue that the court's reliance on *Karels* is misplaced because "*Karels* was not published by the Eighth Circuit until October 15, 2018, nearly two years after the incident in question (which occurred on October 24, 2016), and, thus, was not clearly established 'authority that placed the statutory or constitutional question beyond debate at the time of the alleged violation.'" (Filing 77 at 19, n. 6 (quoting *Goffin v. Ashcraft*, 957 F.3d 858, 861 (8th Cir. 2020)). But, as stated in the *Karels* opinion, the issue presented in that case was whether the law "was clearly established on March 28, 2015." *Karels*, 906 F.3d at 746. The Eighth Circuit panel, relying on a string of earlier decisions dating back to 2009, ruled that the law was clearly established. *Karels* did not make any new law. The Court of Appeals merely held that "*Blazek* and *Wertish* do not establish that the slightest resistance justifies any subsequent use of force by an officer," but "instead establish that an officer may use 'somewhat more force' on a 'passively resistant' suspect." *Id.*

The essential point here is that "[w]hether a reasonable officer would have interpreted [Cotton] as being resistant—either passively or actively—is a disputed

question of fact that a jury must decide." *Id.* at 747.[25] It also cannot be determined from the video footage whether Defendants used more force than was reasonably necessary in executing the take-down maneuver. *See Kingsley*, 576 U.S. at 397 (factors to consider include "the relationship between the need for the use of force and the amount of force used" and "any effort made by the officer to temper or to limit the amount of force"). For purposes of ruling on Defendants' renewed Motion for Summary Judgment, the court must accept Cotton's version of all facts which are not conclusively disproved, and must conclude that the evidence would support a finding that Defendants' use of force violated clearly established law. *See Tolan*, 572 U.S. at 657 ("In holding that [the defendant's] actions did not violate clearly established law, the Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to [the plaintiff] with respect to the central facts of this case. By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party[.] (quoting *Anderson,* 477 U.S., at 249)).

Cotton also claims he was subjected to excessive force after he was taken to the ground, and, accepting the truth of Cotton's sworn statement that he was "pulled down the hallway by the handcuffs behind [his] back" (Filing 43 at 5), the officers' actions in this case would contravene clearly established law as of October 24, 2016. While the Eight Circuit concluded in *Blazek* that the officers were entitled to qualified immunity with respect to their actions in twisting the plaintiff's arm behind his back, throwing him to the floor, jumping on his back, and placing him in handcuffs, the same was not true with respect to the officers' subsequent actions in allegedly grabbing the plaintiff by the arms and forcefully "jerking" him up into his bed. The Court explained:

---

[25] Defendants also seek to distinguish *Karels* as being "a Fourth Amendment case that does not take the legitimate security interests of a correctional setting into account in accordance with *Kingsley*." (Filing 77 at 19, n. 6.) The court agrees that it "must also consider the 'legitimate interests in managing a jail' and give 'deference to policies and practices needed to maintain order and institutional security,'" *Parrish*, 912 F.3d at 467 (quoting *Kingsley*, 576 U.S. at 399-400), but those interests of the correctional institution are only part of the objective reasonableness analysis. *See Kingsley*, 576 U.S. at 399.

The officers' jerking of Blazek from the floor to his bed, however, presents a discrete use of force for consideration under the Fourth Amendment. At that point in the encounter, Blazek was handcuffed and under control. In his telling, Blazek was not resisting and posed no threat to the officers. He was not suspected of any serious offense; he was detained only because he was present at Feldhacker's residence and would not stay seated and identify himself when questioned. Nonetheless, the officers allegedly "jerked" him up by the arms with sufficient force to cause serious injury to his shoulder area.

It was clearly established in 2009 that when a person is subdued and restrained with handcuffs, a "gratuitous and completely unnecessary act of violence" is unreasonable and violates the Fourth Amendment. *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006) (alteration omitted). Pepper spray administered in the face of a subdued arrestee, *id.*, and handcuffs applied so tightly—despite repeated complaints of pain—that they broke the wrist of a compliant arrestee, *Kukla*, 310 F.3d at 1050, were known to violate the Fourth Amendment. There is no prior case involving Blazek's precise factual scenario, but he need not show that the "very action in question has previously been held unlawful" to overcome qualified immunity, as long as the unlawfulness was apparent in light of preexisting law. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Reasonable officers surely could bring Blazek up from the floor in some manner after he was handcuffed, and officers are not required to treat detainees as gently as possible. *See Jackson v. City of Bremerton*, 268 F.3d 646, 652–53 (9th Cir. 2001) (no excessive force where officers "roughly pulled [arrestee] up to her feet during her arrest"); *Thompson v. City of Lawrence*, 58 F.3d 1511, 1516 (10th Cir. 1995) (no excessive force where record showed that officers did not "yank" wrists of handcuffed arrestee with injured shoulder, but rather "lifted" or "raised" him from the floor). But Blazek's allegation is that the officers did more than lift him up roughly. If Blazek can prove at trial that he was subdued and compliant, but that the officers grabbed him by the arms and gratuitously "jerked" him from the floor onto the bed, using enough violent force to cause significant injury, then we agree with the district court that a reasonable jury could find a violation of the Fourth Amendment. And the law was sufficiently developed to

34

show that such a violation—allegedly involving unnecessary violence against a handcuffed and compliant detainee—would contravene clearly established law as of 2009.

*Blazek*, 761 F.3d at 925-26.

Defendants argue that "[t]he second use of force – the wristlock maneuver that was utilized by Stephens after the balance displacement – also did not violate clearly established law.[26] There is no robust consensus of cases establishing such a maneuver as unconstitutional." (Filing 77 at 23.) However, in each of the cases cited by Defendants,[27] the use of the wristlock maneuver was ruled constitutional because the inmate was acting aggressively.

---

[26] Stephens states that "by using the iron wrist lock on Plaintiff, the pain response caused Plaintiff to start moving his body weight in a upwards motion so that Officer Estevez and myself could use that momentum to get Plaintiff up off the floor and into the wheelchair that Officer Hansen had obtained." He also states that the use of this pain compliance method "would have lasted for approximately one second." (Filing 48-4 at 2, ¶ 6.)

[27] *See Ellis v. Chambers*, No. 11-5146, 2012 WL 2449868, *9 (W.D. Ark. May 25, 2012) ("The situation was clearly a volatile one, Plaintiff was acting in an aggressive, confrontational manner, and Defendant Crane was using an appropriate and reasonable level of force to obtain control of Plaintiff and restore order."), *report and recommendation adopted*, 2012 WL 2449867 (W.D. Ark. June 27, 2012); *Wilson v. Stallard*, No. 7:10CV00237, 2010 WL 3291798, at *8 (W.D. Va. Aug. 19, 2010) ("Wilson's disruptive behavior warranted some use of force to restrain the inmate until he resumed compliance with established procedures and to persuade him to do so.... Even if, in hindsight, the amount of pressure applied in the wrist lock was not a 'perfectly measured' response to the degree of threat that Wilson's actions posed, the court must defer to Everidge's determination that this hold was an appropriate means of restoring order."), *aff'd*, 403 F. App'x 797 (4th Cir. 2010); *Mahamed v. Anderson*, No. CIV.07-4815ADM/FLN, 2009 WL 873534, at *3 (D. Minn. Mar. 30, 2009) ("Mahamed can cite to no case where a defendant using a wrist lock has been held liable for using excessive force when the technique is used as a response to the escalation of a confrontation by a plaintiff."); *Snodgrass v. Shasta Cty. Det. Facility*, No. CIV S-07-1491-JAM-CMK, 2009 WL 1456633, at *7 (E.D. Cal. May 22, 2009) ("[A] reasonable officer would have understood that the level of force used by defendant Hicks was not excessive given plaintiff's aggression and the

In this case, Defendants contend the wristlock maneuver was employed because Cotton refused to get up from the floor, or to roll to his side so the officers could get him up into the wheelchair. But Cotton does not even complain about the use of this maneuver. He tells a very different story: "[T]he [missing] video footage would have revealed that when Estevez and Stephens slammed Plaintiff to the floor that Plaintiff was knocked unconscious. Then while Plaintiff was regaining his consciousness both Estevez and Stephens were literally pulling Plaintiff by the handcuffs he wore down the hallway, …. After the defendants pulling [*sic*] Plaintiff up to the wheelchair, he saw at the end of the hallway, Stephen stated 'here's your wheelchair' and then both him and Estevez picked Plaintiff up off the floor and abusively slammed Plaintiff into the wheelchair." (Filing 40 at 11.) "After I was knocked unconscious, and when I was regaining consciousness I was being pulled down the hallway by the handcuffs behind by back, face down and blood pouring out of my eyebrow, Stephens stated, 'let's try this again motherfucker'…. I then remember seeing a wheelchair parked in the hallways doorway and being pulled to it and abusively slammed in it by Estevez and Stephens." (Filing 43 at 5, ¶ 13.) The court therefore concludes that whether the Defendants used "unnecessary violence against a handcuffed and compliant detainee," *Blazek*, 761 F.3d at 926, is also a disputed question of fact that a jury must decide.

In summary, taking the facts in the light most favorable to Cotton, the law was clearly established as of October 24, 2016, that Defendants' conduct violated Cotton's right to be free from excessive force under the Fourteenth Amendment.

## III. CONCLUSION

The court stated in its January 2, 2020 Memorandum and Order that Cotton's sworn statements "create a genuine issue of fact concerning the first prong of the qualified immunity analysis." (Filing 60 at 29.) Perhaps it would have been more

---

need to maintain control."), *report and recommendation adopted*, 2009 WL 10692984 (E.D. Cal. July 6, 2009). The plaintiffs in *Ellis* and *Mahamed* were pretrial detainees; the plaintiffs in *Wilson* and *Snodgrass* were convicted prisoners whose excessive force claims were analyzed under the Eighth Amendment.

appropriate to say that if those statements are accepted as being true (except to the extent they are conclusively disproved by the video evidence), then Cotton can prevail on his excessive force claim. *See, e.g., Liggins v. Cohen*, 971 F.3d 798, 800-01 (8th Cir. 2020) ("The district court thought there were genuine disputes of fact about whether a reasonable officer in Cohen's position 'would have perceived' that [the plaintiff's minor son] B.C. was running toward the officer before he fired and whether it was feasible for the officer to give a warning before shooting.… We agree that these are important questions, but they are not questions of fact for a jury. Once the court has assumed a particular set of facts about where and how B.C. was running in relation to Cohen's position, whether B.C.'s actions rose to a level warranting Cohen's use of force is a question of law for the court, not a question of fact." (citing *Scott*, 550 U.S. at 381 n. 8)) (on interlocutory appeal from denial of summary judgment motion,[28] reversing district court's determination that officer was not entitled to qualified immunity); *K.W.P. v. Kansas City Pub. Sch*., 931 F.3d 813, 821 (8th Cir. 2019) ("Here, the district court denied qualified immunity to [the defendants] because it determined that 'extensive factual disputes' exist.… 'True, but that is not the correct inquiry. The correct inquiry is whether, even if we construe the facts in a light most favorable to [the plaintiff], a reasonable official in [the defendant's] position would have known that [he or she] was violating the [C]onstitution ....'" *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018).… 'Thus, a defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity "must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal."' *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007) (quoting *Gonzales* [*v. Dallas Cty., Tex.*, 249 F.3d 406, 411 (5th Cir. 2001)]). Therefore, in assessing [the plaintiff's] claim, we must construe the facts in the light most favorable to [the plaintiff] to determine whether a constitutional violation occurred and whether any violation of a constitutional right was clearly established."). Similarly, while the

---

[28] The Court of Appeals has jurisdiction to review the denial of a motion for summary judgment that was based on qualified immunity. *Ivey v. Audrain Cty*, 968 F.3d 845, 848 (8th Cir. 2020). The Court lacks jurisdiction, however, "if the pretrial record sets forth genuine issues of fact necessary for resolution of the interlocutory appeal." *Curtis v. Christian Cty.*, 963 F.3d 777, 782 (8th Cir. 2020) (quoting *Nord v. Walsh Cty.*, 757 F.3d 734, 738 (8th Cir. 2014)).

court stated in its January 2, 2020 Memorandum and Order that there were disputed questions of fact as to whether a reasonable officer would have interpreted Cotton as being resistant and whether unnecessary violence was used against a handcuffed and compliant detainee (Filing 60 at 33), the basis for the court's ruling was that if Plaintiff's version of the facts is accepted as true, then Defendants actions violated Plaintiff's constitutional rights under clearly established law.

For the reasons explained in the foregoing opinion, the court finds neither Defendant is entitled to qualified immunity because the facts, taken in the light most favorable to Cotton, show the conduct of each officer violated Cotton's right to be free from excessive force under the Fourteenth Amendment, and this constitutional right was clearly established as of October 24, 2016.

IT IS THEREFORE ORDERED:

1.     Plaintiff's motion to appoint counsel (Filing 111) is denied without prejudice to reassertion.

2.     Defendants' motion for summary judgment (Filing 75) is denied.

3.     The Final Pretrial Conference will be held before Magistrate Judge Cheryl R. Zwart on **April 15, 2021 at 10:00 a.m.** Prior to the pretrial conference, all items as directed in NECivR 16.2 and full preparation shall have been completed so that trial may begin at any time following the Pretrial Conference.

4.     Defense counsel will have the primary responsibility for drafting the Order on Final Pretrial Conference, pursuant to the format and requirements set out in NECivR 16.2(a)(2). Plaintiff will be responsible for cooperating in the preparation and signing of the final version of the Order. The Order should be submitted to Plaintiff by March 11, 2021. Plaintiff shall provide additions and/or proposed deletions to Defense counsel by March 25, 2021. Defense counsel shall submit the Proposed Order on Final Pretrial Conference to the court by no later than April 8, 2021. If a party proposes an addition or deletion which is not agreed to by all the other parties, that fact should be noted in the text of the document. The Proposed

Order on Final Pretrial Conference must be signed by all pro se parties and by counsel for all represented parties.

5.     If Plaintiff is held in an institution, the pretrial conference will be by telephone. In that case, Defense counsel shall contact Plaintiff's institution in advance and arrange to initiate and place the conference call.

6.     The trial date will be set by the Magistrate Judge at the time of the Final Pretrial Conference.

Dated this 21st day of December, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge